

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
04/17/2008

| | | |
|---|---|---|
| IN RE: | § | |
| AMY LEARY, CHRISTOPHER J. LEARY | § | CASE NO: 07-31370 |
| Debtor(s) | § | |
| | § | CHAPTER  7 |

**MEMORANDUM OPINION**
**REGARDING THE APPLICATION OF**
**BANKRUPTCY CODE § 707(b)(2) "PRESUMPTION OF ABUSE"**
**TO US TRUSTEE'S MOTION TO DISMISS (Doc. #21)**

In this contested matter (docket # 21) the United States Trustee (the "UST") asks the Court to dismiss this chapter 7 case filed by Amy and Christopher Leary (the "Debtors").  The UST alleges (docket # 21) that granting chapter 7 bankruptcy relief for these Debtors would be an abuse of the Bankruptcy Code.  The parties have stipulated to certain facts for purposes of determining whether the "presumption of abuse" (defined by § 707(b)(2)) applies.[1]  The Court's ruling in this opinion determines only whether certain deductions can be taken when applying the statutory formula.  For reasons set forth below, Debtors will not be allowed a deduction for secured debts on property that they have surrendered but they will be allowed the deduction for vehicles as specified in the National and State Standards without reference to the Internal Revenue Manual.

## I.    UNDISPUTED FACTS

Both parties have stipulated to the following:

In May, 2006, Mr. Leary's employer transferred him from Pennsylvania to Texas, and the family moved their residence to Texas. The Debtors lived in a relocation apartment for sixty days before entering into a residential lease of a house in August, 2006.

Debtors filed their voluntary petition commencing this case under chapter 7 of the Bankruptcy Code on March 1, 2007.

At the time of the relocation to Texas in May, 2006, as well as at the time that they filed their bankruptcy petition, Debtors owned a home at 311 Woodbridge Ln., Douglasville, PA ("Pennsylvania Property"). Bankruptcy schedule D lists a debt to Chase Manhattan Mtg. in the amount of $226,577.60 and a debt to Sovereign Bank in the amount of $90,000.00.  Both debts are secured by liens on the Pennsylvania Property.  The schedules also list ad valorem taxes owed on Pennsylvania Property in the amounts of $1,800.00 and $6,357.70. The last payment that Debtors made on the Pennsylvania Property was in October, 2006. Debtors were actively marketing the home for sale until the date of filing of the petition on March 1, 2007.

---

[1] All section references are to the Bankruptcy Code, 11 U.S.C., unless otherwise noted.

Also listed on Schedule D was secured debt for Tahiti Village Timeshare ("Timeshare") owed to Solei LV, LLC in the amount of $10,800.00. Debtors are not current on the contract for the Timeshare.  The last payment that Debtors made on the Timeshare was October 2006.

Debtors Statement of Intention filed March 1, 2007, indicates that the Debtors intended to surrender the Pennsylvania Property as well as the Timeshare. The Statement of Intention filed March 28, 2007, indicates the same intention, to surrender both the Pennsylvania Property and the Timeshare.

When they filed their bankruptcy petition, the Debtors were not living in the Pennsylvania Property and were not current on their obligations under the mortgages or on ad valorum taxes.

A Motion to Lift Stay on the Pennsylvania Property was filed by Chase Home Finance LLC on March 16, 2007.  An Agreed Order Granting Relief from Automatic Stay on the Pennsylvania Property was entered April 9, 2007 (Doc. #13).  As of August 10, 2007, the mortgage company had not foreclosed on the Pennsylvania Property, but the home was scheduled to be sold at a Sheriff's sale on September 7, 2007.

The Debtors have a 2003 Mazda MPV with approximately 90,000 miles, subject to a secured claim and security interest of $8,785.72 owed to Capital One Auto Finance.  The Debtors filed a statement of intention to reaffirm the debt on the 2003 Mazda MPV.  The monthly payment is $313.80.  As of May 22, 2007, there were 28 monthly payments remaining.

The Debtors also have a 2002 Nissan Altima with more than 81,000 miles.  There is no debt on that vehicle.

## II.    JURISDICTION

This Court has jurisdiction over this motion by authority of 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. § 1408.

The UST has standing to bring this motion by authority of 11 U.S.C. §§ 307, 704(b) and 707(b)(1).

## III.    ISSUES

1.    Whether, for purposes of determining application of the Bankruptcy Code § 707(b)(2) presumption of abuse, Debtors may deduct payments related to collateral that they intend to surrender, *i.e.* the Pennsylvania Property and the Timeshare.

2.    Whether, for purposes of determining application of the Bankruptcy Code § 707(b)(2) presumption of abuse, the Debtors are eligible to claim the IRS Local Standard transportation ownership/lease expense for a vehicle they own debt-free.

## IV.   CONCLUSIONS OF LAW

One of the express statutory grounds for dismissal of a chapter 7 bankruptcy case is whether "relief would be an abuse of the provisions of … chapter [7]."

> After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, trustee (or bankruptcy administrator, if any), or any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter….

11 U.S.C. § 707(b)(1).

A.   Abuse and the Means Test

The Means Test was introduced into the Bankruptcy Code by BAPCPA.[2]  Perhaps the most striking characteristic of that statute is its clear objective to substitute mathematical requirements and formulas for the exercise of discretion by bankruptcy judges.  That is probably nowhere more clear than in the application of the "means test."  Whether Congress has written, and whether it is possible to write, a clear statement in English that prescribes a formula that can be applied to the wide variety of complex financial situations in American society, and whether that game is worth the candle, are more difficult questions.

BAPCPA requires the Court to presume abuse by an individual debtor if the objective financial test in Bankruptcy Code § 707(b)(2) is satisfied.  The first part of § 707(b)(2) requires a determination of whether a debtor's current monthly income (defined by § 101(10A)) is lower than the state median income for a household of the same size.  If the debtor's income is below the median, the means test does not apply.  Bankruptcy Code § 707(b)(7).  If the debtor's income exceeds the state median, that monthly income is reduced by expenses specified by statute.  The difference is multiplied by 60, and if that product exceeds the lesser of (i) the greater of 25% of the debtor's nonpriority unsecured claims or $6,575, or (ii) $10,950, then the presumption of abuse arises.  If the presumption of abuse arises, it can be rebutted only by a complicated formula set out in § 707(b)(2)(B).

Current monthly income is the average monthly income that the debtor received during the 6-month period ending on the last day of the calendar month preceding the filing of the petition.  Bankruptcy Code § 101(10A).  One set of statutory deductions is the "applicable monthly expense amounts specified under the National Standards and Local Standards . . ." issued by the Internal Revenue Service, including amounts for transportation.  Bankruptcy Code § 707(b)(2)(A)(ii); 6 *Collier on Bankruptcy*, ¶ 707.05[2][c] (15th ed. rev. 2006).  Another set of deductions is the total amount payable on secured debts averaged over the 60 month period following the petition date.  Bankruptcy Code § 707(b)(2)(A)(iii).

---

[2] Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005) (codified as amended at 11 U.S.C. §§ 101-1532).

The jurisprudence, Debtors, and the UST agree that statutory construction begins, and should end, with the plain meaning of the statute.  See, *Toibb v. Radloff*, 501 U.S. 157 (1991).  This Court agrees that "plain meaning" is the alpha and the omega of its function.  And the Court of Appeals for the Fifth Circuit instructs that:

> [A]s with any statutory analysis, we begin with the words of the
> statute, keeping in mind that "the meaning of statutory language,
> plain or not, depends on context."

*In re Cortez*, 457 F.3d 448, 454 (5th Cir. 2006).

But if dozens of different judges come to dozens of different conclusions about the meaning of the text, one should seriously question whether the statute has a "plain meaning."

B.      Bankruptcy Code § 707(b)(2)(A)(iii):  Whether the Debtors are eligible to claim the expense for collateral which they intend to surrender in calculating their disposable income under the statutory means test

> The debtor's average monthly payments on account of secured
> debts shall be calculated as the sum of--
> > (I) the total of all amounts scheduled as contractually due to
> > secured creditors in each month of the 60 months following the
> > date of the petition; and
> > (II) any additional payments to secured creditors necessary for
> > the debtor, in filing a plan under chapter 13 of this title, to
> > maintain possession of the debtor's primary residence, motor
> > vehicle, or other property necessary for the support of the
> > debtor and the debtor's dependents, that serves as collateral for
> > secured debts;divided by 60.

Bankruptcy Code § 707(b)(2)(A)(iii).

The UST contends that the language "the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition" would exclude payments scheduled for collateral to be surrendered.  Debtor disagrees.

1.      "following"

The UST places emphasis on the word "following" and concludes that deductions are allowed only if payments actually will be made after the petition date.  Under this interpretation payments for property that will be surrendered would not qualify.

Using strict interpretation of these specific words, the Court would disagree.  The word "following" is not defined in the Bankruptcy Code; therefore the ordinary definition should be used.  *Smith v. U.S.,* 508 U.S. 223, 229 (1993) ("When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning.").  "Following" is a preposition, defined as "subsequent to."  Webster's New Collegiate Dictionary 442 (G & C Merriam Co. 1979).  The word as used in the text of the statute is part of the prepositional

phrase, "following the date of the petition."  This phrase has an adjectival function in the larger phrase "the 60 months following the date of the petition."  In this context the function of "following" is unmistakeable.  The word merely specifies which 60 months are included in the test..  "Following" does not address whether the Court considers payments that are actually made during that 60 months, payments for which debtors are contractually responsible during that 60 months, or some other payments during that 60 months.  "Following" just specifies "which" 60 months.  The word "following" is not the important issue here.

    2.    "scheduled"

    The word "schedule" has risen to a term of art in the bankruptcy world because § 521(a) requires a debtor to file "schedules" of assets, debts, income, and deductions as enumerated in the statute and rules.  However the term is not explicitly defined, and whether § 707(b) invokes "scheduled" as the term of art or only its ordinary meaning is not immediately clear; the definition of the word has been the subject of much debate.  See, *In re Walker*, 2006 WL 1314125 (Bankr. N.D. Ga. 2006); *In re Skaggs*, 349 B.R. 594 (Bankr. E.D. Mo. 2006); *In re Singletary*, 354 B.R. 455 (Bankr. S.D. Tex. 2006); *In re Nockerts*, 357 B.R. 497 (Bankr. E.D. Wis. 2006) (this appears to be the earliest case to survey the Bankruptcy Code for use of the word).

    As noted in *Nockert*, the phrase "scheduled as contractually due" is unique to § 707(b)(2).  The Court had undertaken its own broad survey of the Bankruptcy Code for the use of the word "scheduled" to look at the statute "in whole."  The Court finds twelve other sections that use the word.  The first examples unambiguously demonstrate the use of the ordinary meaning of the word:

        Any hearing under paragraph (2)(B) of this subsection may be a preliminary hearing or may be consolidated with a hearing under subsection (e) of this section, but shall be <u>scheduled</u> in accordance with the needs of the debtor.
Bankruptcy Code § 363(c)(3).

        At a <u>scheduled</u> meeting of a committee appointed under section 1102 of this title…
Bankruptcy Code § 1103(a).

        Any hearing under this paragraph shall be <u>scheduled</u> in accordance with the needs of the trustee.
Bankruptcy Code § 1113(e); see also § 1114(h)(2).

        [A]ttend, through its senior management personnel and counsel, meetings <u>scheduled</u> by the court…
Bankruptcy Code § 1116(2).

    Explicit reference to § 521(1) or context unambiguously demonstrate where the word is used as a term of art:

>> (3) neither listed nor <u>scheduled</u> under section 521(1) of this title, with the name, if known to the debtor, of the creditor to whom such debt is owed, in time to permit…
>>
>> …
>>
>> (10) that was or could have been listed or <u>scheduled</u> by the debtor in a prior case concerning the debtor under this title or under the Bankruptcy Act in which the debtor waived discharge, or was denied a discharge…

Bankruptcy Code § 523(a).

>> Unless the court orders otherwise, any property <u>scheduled</u> under section 521(1) of this title not otherwise administered at the time of the closing of a case is abandoned to the debtor and administered for purposes of section 350 of this title.

Bankruptcy Code § 554(c).

>> A proof of claim or interest is deemed filed under section 501 of this title for any claim or interest that appears in the schedules filed under section 521(1) or 1106(a)(2) of this title, except a claim or interest that is scheduled as disputed, contingent, or unliquidated.

Bankruptcy Code § 1111(a).

These examples demonstrate that the word is defined by context and is not limited to its definition as a term of art.  The final category of examples uses the word in the more specific context of debts:

>> [B]y making the statement: "Your payment schedule will be:", and describing the repayment schedule with the number, amount, and due dates or period of payments <u>scheduled</u> to repay the debts reaffirmed to the extent then known by the disclosing party…

Bankruptcy Code § 524(k)(3)(H)(ii).

>> Until 60 days after an agreement of the kind specified in subsection (c) is filed with the court (or such additional period as the court, after notice and a hearing and for cause, orders before the expiration of such period), it shall be presumed that such agreement is an undue hardship on the debtor if the debtor's monthly income less the debtor's monthly expenses as shown on the debtor's completed and signed statement in support of such agreement required under subsection (k)(6)(A) is less than the <u>scheduled</u> payments on the reaffirmed debt.

Bankruptcy Code § 524(m)(1).

>> [T]he debtor shall commence making payments… <u>scheduled</u> in a lease of personal property…

Bankruptcy Code § 1326(a)(1)(B).

In these examples, "scheduled" refers not to bankruptcy schedules, but to a schedule (like a series of calendar events) created by the related contract, *e.g.*, a reaffirmation agreement or a lease. "Scheduled as contractually due" best fits into this category. Section 707(b)(2) includes no reference to the § 521(1) bankruptcy schedules. The Court concludes that "scheduled" in § 707(b)(2) refers to the series of calendar events defined by the contract that obligates the debtor to make payments to the secured creditors.

This is consistent with the phrase "scheduled as contractually due." *Skaggs* and its progeny have read "scheduled" as a term of art and conclude that what is "scheduled as contractually due" is determined by the Debtor's schedules and statements. 349 B.R., at 599. While the Court respects that interpretation, to this Court that interpretation interprets the sentence backwards. "Contractually due" modifies "scheduled." Therefore to determine what is "scheduled" one must look at what is "contractually due." Had Congress intended to the conclusion reached in *Skaggs*, that one must look to the schedules under § 521, the grammatical way to phrase this would be "contractually due as scheduled."

If this were the only context, the Court would conclude that filing a statement of intention to surrender collateral would have little effect on what is "contractually due."

> The surrender of the collateral does not change the fact that the payments are 'contractually due.' When a debtor files the bankruptcy petition, the debtor is contractually due for payments on the outstanding secured debts for the length of the contract. The debtor's contractual liability for the debt is not eliminated upon the surrender of the collateral… In other words, nothing the debtor does or does not do changes the fact that scheduled payments remain contractually due.

*Walker*, 2006 WL 1314125, at *4, 2006 Bankr.LEXIS 845, at *12-13.

3.    Application of *Cortez* and Interpretation of "Contractually Due" in the Required Context

Therefore, strict interpretation of the language of the statute would seem to allow deduction of these secured payments. However § 707(b)(2) must be interpreted in the context of determining whether "granting of relief" would be abusive of chapter 7. Although *Cortez*[3] decided a case to which § 707(b)(2) did not apply, in that case the Fifth Circuit held that "granting of relief" referred to the discharge order, not to the petition. Therefore, to interpret §707(b)(2)(A)(iii) "in context," the Court must look to the "amounts contractually due to secured creditors" as of the date of entry of the discharge.

To this extent, the Court respectfully disagrees with the opinion in *In re Singletary*, 354 B.R. 455 (Bankr. S.D. Tex. 2006). The *Singletary* analysis concludes that the time for application of the formula in § 707(b)(2) is the time that the motion to dismiss was filed. But

---

[3] *In re Cortez*, 457 F.3d 448 (5ᵗʰ Cir. 2006).

*Cortez* did not attach any significance to the date that the motion to dismiss was filed.  *Cortez* held that because § 707(b) refers to abuse at the time the court grants "relief," *i.e.* the discharge, the court must look to developments postpetition.[4]

Regardless of the rules of grammar, if the Court is required by *Cortez* to interpret "amounts scheduled as contractually due to secured creditors" in the context of whether a presumption of abuse arises, and if abuse is defined in terms of whether a debtor is able postpetition to pay creditors in a chapter 13 case, the Court cannot allow a deduction for a debt that debtors will not pay because of abandonment, surrender, and discharge.

C.      Bankruptcy Code § 707(b)(2)(A)(iii):  Whether the Debtors are eligible to claim the IRS Local Standard transportation ownership/lease expense in calculating their disposable income under the statutory means test for a vehicle they own debt-free.

The second deduction in dispute is an allowance for vehicles under the IRS National and Local Standards.  The statute defines the deduction as follows:

> The debtor's monthly expenses shall be the <u>debtor's applicable monthly expense amounts specified under the National Standards and Local Standards,</u> . . . issued by the Internal Revenue Service for the area in which the debtor resides, as in effect on the date of the order for relief, for the debtor, the dependents of the debtor, and the spouse of the debtor in a joint case, if the spouse is not otherwise a dependent…

Bankruptcy Code § 707(b)(2)(A)(ii)(I) (emphasis added).

1.      "applicable"

Debtor and the UST agree that "applicable" does not mean "actual."  *In re Slusher*, 359 B.R. 290 (Bankr. D. Nev. 2007) (A natural reading of the section indicates that the words "actual" and "applicable" limit the relevant expense deductions in different ways.); *In re Chamberlain*, 369 B.R. 519 (Bankr. D. Ariz. 2007) (Congress' use of "actual" to modify a different expense makes it a stretch to interpret "actual" and "applicable" to mean the same thing.).  Both further agree that "applicable" modifies "amounts specified."  However, they disagree about what makes an expense "applicable."

The UST asserts that Debtors' Amended Form B22A is erroneous because it includes a deduction of $332 for owning a car even though the Debtor does not have a monthly car payment.  The UST argues that "applicable" means that the ownership expense amount is not deductible unless the debtor has a lease or purchase payment obligation.

---

[4] The *Singletary* analysis has the benefit of practicality.  As the *Cortez* facts illustrate, circumstances change between the bankruptcy petition date, the date that a dismissal motion is filed, the date that the hearing is held, the date that the decision is rendered, the date that the appeal is decided, and (if the case is not dismissed) the date that the discharge is issued.  It is not clear how the Court is to consider events throughout that timeline.  *Cortez* illustrates how difficult that decision process can be with respect to changing income.  When the issue is postpetition secured debt related to abandoned property, thankfully the issue is much simpler.

Debtors argue that "applicable" pertains to the geographical region and the number of cars owned by the debtor.  Actual expenses (such as a car payment) are irrelevant to the Local Standards, which is a fixed amount, not a cap.  Debtors argue that they are entitled to the deduction under the plain language of § 707(b)(2)(A)(ii)(I).

          a.      The National and Local Standards

*Chamberlain* explains the National and Local Standards:

> The National and Local Standards, to which § 707(b)(2)(A)(ii)(I) refers, are the Collection Financial Standards used by the Internal Revenue Service (the "IRS") to determine a taxpayer's ability to pay a delinquent tax liability.  Based primarily on data from the United States Census Bureau and the Bureau of Labor Statistics Consumer Expenditure Survey, the "National Standards" set , as objectively reasonable, amounts for five expenses:  (1) food, (2) housekeeping supplies, (3) apparel and services, (4) personal care products and services, and (5) miscellaneous.  The National Standards are based on the taxpayer's gross income and family size.

> The "Local Standards" set, as objectively reasonable, separate amounts for (1) housing and utilities, and (2) transportation.  The former are based on the taxpayer's family size and location.  The transportation Standards include two distinct components:  (1) "Ownership Costs," which are based only on the number of cars owned by the taxpayer; and (2) "Operating Costs & Public Transportation Costs," which are based on the number of cars owned by the taxpayer and on the taxpayer's location.

*Chamberlain*, 349 B.R., at 416-17 (citation omitted).

National and Local Standards are different from the Internal Revenue Manual ("IRM").  The IRM instructs IRS field agents with respect to using the National and Local standards to determine a taxpayer's ability to pay when the agent is trying to collect delinquent taxes.  For the Local Standards (which apply to transportation expenses) the IRM provides that, "[t]he taxpayer is allowed the local standard or amount actually paid, *whichever is less*."

While this may be binding on IRS agents, the limitation should not apply to, § 707(b)(2)(A)(ii)(I).  That section does not refer to the IRM; it refers only to the National and Local Standards.  There is nothing in the statutory language of § 707(b)(2)(A)(ii)(I) that refers to the debtor's actual transportation expenses of any kind, except under the "Other Necessary Expenses" category.  Nor does the statutory language suggest that the amounts specified in the Standards are to be used only as maximums, rather than as the expense amounts to be deducted. The Standards themselves do not make this limitation.  Any such limitation would derive solely from the IRM, which is not referenced in the statute.

*Collier on Bankruptcy* agrees with this analysis:

> The statute is not crystal clear about how transportation expenses are computed. The better view is that, because the language refers to deducting the "amounts specified" in the standards, and not actual expenses, the ownership allowance specified in the standards is the minimum amount to be deducted for the expense of car ownership, rather than the remaining car payments on a vehicle, if any, divided by 60 permitted by a later subparagraph. This is the position taken by the Advisory Committee on Bankruptcy Rules in drafting Official Form 22A. In fact, the literal language of the provisions could lead to a conclusion that both the "amounts specified" and the secured debt payments should be deducted, which would allow double counting of some of those payments.

> The argument that only the remaining secured debt payments, and not the full ownership allowance, may be deducted does not withstand textual or policy scrutiny. This argument is based on language in the same paragraph stating "the monthly expenses of the debtor shall not include any payments for debts." This language means simply what it says: Although the IRS Other Necessary Expense standards permit debtors to make payments on other secured and unsecured debts, such payments are not allowed as part of the means test use of the IRS standards. The amounts deducted under the transportation ownership allowance are not payments for debts. They are the "amounts specified" by the allowance. It is more logical to conclude that the language prevents secured debt payments, which are allowed under a separate provision of the means test, from being double counted as part of the application of the IRS standards. <u>Moreover, the argument that the language means the transportation ownership allowance cannot be allowed for a debtor with a car loan because it is a debt payment also proves too much.</u> Under the Code's definition of "debt," if no payment for any item that constitutes a debt were permitted under the local standards, debtors could not deduct any expenses for housing or transportation if they had a housing lease or an automobile lease, since an obligation on a prepetition lease is indisputably a debt. In addition, on policy grounds, allowing debtors to deduct only the remaining portion of their secured debt would leave them with no funds to replace an old car needed to continue employment, a result that would certainly not enhance either repayment of creditors or a fresh start.

> For these reasons, the better reasoned decisions considering this issue have permitted debtors to deduct the amounts specified for

the transportation ownership expense allowance even if they do not have an obligation to make car loan payments or are intending to surrender the vehicle. These courts have rejected the arguments of the United States trustee that the allowance should not be allowed in such cases because the Internal Revenue Service would not allow it in its financial analysis. As one court pointed out, the legislative history undercut this argument.

*Collier on Bankruptcy, id.,* at ¶ 707.05[2][c] (emphasis added).

      b.      Legislative History

The IRS is not an administrative agency that administers the Bankruptcy Code, so there is no basis for a Court to defer to its administrative expertise. *Chamberlain*, 369 B.R., at 513 (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 513 (1994)). The statutory language explicitly refers to the Standards, but fails to mention the IRM. The legislative history demonstrates this is not negligent omission but intentional silence. A prior version of BAPCPA (which was not adopted) used the following language:

> (A) the expense allowances under the applicable National Standards, Local Standards, and Other Necessary Expenses allowance (excluding payments for debts) for the debtor… in the area in which the debtor resides as determined under the Internal Revenue Service financial analysis for expenses in effect as of the date of the order for relief.

H.R. 3150, 105th Congress (1998).

That language was ultimately rejected in favor of the current § 707(b)(2)(A) which simply states that a debtor is allowed the "applicable monthly expense amounts specified under the National Standards and Local Standards."

      c.      Conflicting Case Law

Some courts that have concluded that the IRM is instructional in applying the Standards to § 707(b)(2)(A)(ii)(I). Those courts relied on the IRS instruction to its agents who are compromising tax liability that "[i]f a taxpayer has no car payment, or no car, the operating costs portion of the transportation standard is used to come up with the allowable transportation expense," i.e., the ownership expense is not applicable to the taxpayer. IRS Collection Standards, available at www.irs.gov/individuals/article/0,,id=96543,00.html; *see also* Financial Analysis Handbook, IRM at 5.15.1.7 ¶ 4.B. The instruction is then applied to § 707(b)(2)(A)(ii)(I), as concluded in *In re McGuire*, 342 B.R. 608, 613 (Bankr. W.D. Mo. 2006), "[i]f a debtor is not incurring expenses for the purchase or lease of a vehicle, the debtor cannot claim a vehicle ownership expense under the IRS Standards." Such a conclusion confuses "ownership" with "liability for debt."

But in any event, there is no ambiguity in the statute that justifies the Court to wander that far afield looking for assistance in interpreting the statutory language.  The Local Standards, to which the statute explicitly refers, are fixed deductions not caps on the deduction.

    2.        Policy

Judge Wedoff discusses the means test at length, and in particular why allowing the deduction on a vehicle owned free and clear under the Local Standards makes sense in the article Means Testing in the New § 707(b).  Wedoff, *Means Testing in the New § 707(b)*, 79 Am. Bankr. L.J. 231, 256-59.  *Collier* summarizes:

> The amounts deducted under the transportation ownership allowance are not payments for debts. They are the "amounts specified" by the allowance. It is more logical to conclude that the language prevents secured debt payments, which are allowed under a separate provision of the means test, from being double counted as part of the application of the IRS standards. Moreover, the argument that the language means the transportation ownership allowance cannot be allowed for a debtor with a car loan because it is a debt payment also proves too much. Under the Code's definition of "debt," if no payment for any item that constitutes a debt were permitted under the local standards, debtors could not deduct any expenses for housing or transportation if they had a housing lease or an automobile lease, since an obligation on a prepetition lease is indisputably a debt. In addition, on policy grounds, allowing debtors to deduct only the remaining portion of their secured debt would leave them with no funds to replace an old car needed to continue employment, a result that would certainly not enhance either repayment of creditors or a fresh start.

*Collier on Bankruptcy*, *id.* at ¶ 707.05[c][i].

For these reasons, the Court concludes that the better interpretation of "applicable" is that it refers to Local Standards deduction depending on debtor's local area and the number of cars. Debtors may deduct the expense under the Local Standards for a vehicle owned free and clear.

### V.    CONCLUSION

Debtors will not be allowed a deduction for secured debts on property that they have surrendered but they will be allowed the deduction for vehicles as specified in the National and State Standards without reference to the IRM.  By separate order issued this date, the Court will set a Rule 7016 conference for preparation, scheduling, and trial of the remaining issues.

SIGNED 04/16/2008.

                                         Wesley W. Steen
                                         United States Bankruptcy Judge